# Authority to Use Funds from Fiscal Year 1990 Appropriation to Cover Shortfall from Prior Award Year's Pell Grant Program

The Pell Grant Program's lump sum appropriation for fiscal year 1990 may be used to pay the deficiencies in the program's funding for the 1989-90 award year.

March 29, 1990

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF EDUCATION

This memorandum responds to your request for advice concerning a dispute between the Department of Education ("the Department") and the Office of Management and Budget ("OMB") over the funding of the Pell grant program, 20 U.S.C. §§ 1070-1070f.[1] The question presented is whether Pell grant funds appropriated in the Departments of Labor, Health and Human Services, and Education and Related Agencies Appropriations Act, 1990 ("FY 1990 Appropriations Act"), Pub. L. No. 101-166, 103 Stat. 1159 (1989), may be used to cover Pell grant program expenses for both the 1989-90 and 1990-91 "award years," and in particular whether the program's projected shortfall for the 1989-90 award year can be met by using appropriated funds in excess of the $131,000,000 that the FY 1990 Appropriations Act states "shall be available only for unfinanced costs in the 1989-90 award year Pell Grant program." Pub. L. No. 101-166, 103 Stat. at 1181. We conclude that the lump sum appropriation in the FY 1990 Appropriations Act may be used to pay the deficiencies in the program's funding for the 1989-90 award year.

## I. Background

Title IV of the Higher Education Act of 1965, as amended, authorizes the Pell grant program and declares that its purpose is "to assist in making available the benefits of postsecondary education to eligible students." 20 U.S.C. § 1070a. The basic grants provided under the program are intended,

---

[1] *See* Letter for William P. Barr, Assistant Attorney General, Office of Legal Counsel, from Edward C. Stringer, General Counsel, Department of Education (Jan. 12, 1990) ("Stringer Letter"), and accompanying Memorandum of Law (Nov. 13, 1989) ("Education Memorandum").

within statutory limits, to meet up to sixty percent of an eligible student's cost of attendance. *Id.* § 1070a(b)(1), (3). The statute also sets forth criteria of eligibility, expected family contributions, and the amount of each grant. *Id.* §§ 1070a to 1070a-4.

Congress has funded the Pell grant program with appropriations that are available for obligation over a period of two fiscal years. The federal government's fiscal year begins on October 1 and ends on the following September 30. *See* 31 U.S.C. § 1102. An "award year" is defined at 20 U.S.C. § 1070a-6(3) as "the period of time between July 1 of the first year and June 30 of the following year." Thus, a Pell grant award year begins three months before the start of a fiscal year and runs through the first nine months of that fiscal year. Generally, Pell grant appropriations have been justified in budget submissions to Congress for the *next* award year, *i.e.*, the award year that will begin nine months *after* the start of the first fiscal year covered by the appropriation. *See* Stringer Letter at 1; Letter for Lynda Guild Simpson, Deputy Assistant Attorney General, Office of Legal Counsel, from Rosalyn J. Rettman, Associate General Counsel for Budget, Office of Management and Budget at 9 (Feb. 6, 1990)("Rettman Letter").

Budget estimates of the cost of the Pell grant program for a future award year depend on several variables, including the number of eligible students and the extent of family contributions, that are difficult to predict. There is also a substantial time lag between the submission of a budget request to Congress based on estimates of funds that will be needed, and the completion of the award year for which appropriations have been made, when the actual costs of the program can finally be known. *See* Education Memorandum at 3, 4. Thus, the amounts appropriated for the program in a given fiscal period and the program's actual cost in the corresponding award year almost inevitably fail to match. The authorizing statute provides methods for handling these mismatches. Section 1070a(h) of title 20, U.S. Code provides for the disposition of excess funds, and section 1070a(g) provides for the Department to make program cuts by applying a "linear reduction" formula to certain grants if appropriations for any fiscal year do not suffice to satisfy fully all entitlements.[2]

The Pell grant program has suffered from recurring funding deficiencies that began in the late 1970s. Congress usually addressed these deficiencies

---

[2] 20 U.S.C. § 1070a(g) provides as follows:

(1) If, for any fiscal year, the funds appropriated for payments under this subpart are insufficient to satisfy fully all entitlements, as calculated under subsection (b) of this section, the amount paid with respect to each entitlement shall be—

(A) the full amount for any student whose expected family contribution is $200 or less, or

(B) a percentage of that entitlement, as determined in accordance with a schedule of reductions established by the Secretary for this purpose, for any student whose expected family contribution is more than $200.

(2) Any schedule established by the Secretary for the purpose of paragraph (1)(B) of this subsection shall contain a single linear reduction formula in which the percentage reduction increases uniformly as the entitlement decreases and shall provide that if an entitlement is reduced to less than $100, no payment shall be made.

by providing, in annual appropriations acts between 1979 and 1987, that the lump sum appropriation would first be available to meet any deficiency from the award year that was in progress when the fiscal year began. For example, the FY 1979 Appropriations Act, Pub. L. No. 95-480, 92 Stat. 1567, 1579 (1978), provided that "amounts appropriated for basic opportunity grants shall first be available to meet any insufficiencies in entitlements resulting from the payment schedule . . . published by the Commissioner of Education during the prior fiscal year." This language was slightly altered beginning with a FY 1983 Appropriations Act, Pub. L. No. 97-377, 96 Stat. 1897 (1982), which stated that "amounts appropriated for Pell Grants shall be available first to meet any insufficiencies in entitlements resulting from the payment schedule for Pell Grants published by the Secretary of Education for the 1981-1982 academic [*i.e.,* award] year."[3] During this period, the "Budget Justifications submitted by the Executive Branch reflect a fairly, consistent view that the provisions were added to *permit* use of the appropriations for the prior award year." Education Memorandum at 8.

In 1987, Congress changed this practice by enacting a $287,000,000 supplemental appropriation. *See* Pub. L. No. 100-71, 101 Stat. 391, 421 (1987) ("Supplemental Appropriation Act, 1987"). This supplemental appropriation forestalled any need to state in the FY 1988 Appropriations Act that FY 1988 funds were to be first available to retire the shortfall from the award year then in progress. Moreover, no such language was contained in the FY 1989 Appropriations Act.[4]

Before the beginning of FY 1990, the Administration forecast a shortfall for the award year 1989-90 of some $331,000,000. OMB informed Congress that the Administration would impose the linear reductions mandated by 20 U.S.C. § 1070a(g) unless Congress appropriated sufficient funds to cover the projected deficiency. Congress, however, relied on the cost estimates calculated by the Congressional Budget Office, which suggested a funding shortfall of not more than $131,000,000. *See* H.R. Conf. Rep. No. 274, 101st Cong., 1st Sess. 40-41 (1989); *see also* Pub. Papers of George Bush 1373 (Oct. 21, 1989) (President's veto message on H.R. 2990, noting that legislation underfunded Pell grant program). In light of that lower estimate, Congress provided in the FY 1990 Appropriations Act that the Secretary would have an "additional" $131,000,000 to be "available only" for the anticipated shortfall. In relevant part, the statutory language reads:

> For carrying out subparts 1, 2, and 3 of part A and parts C, D, and E of title IV of the Higher Education Act, as amended,

---

[3] *See* Stringer Letter at 3; Education Memorandum at 2, 7 and Attachment B (quoting relevant language from appropriations acts); Rettman Letter at 2-3.

One exception to this pattern should be noted. Language similar to that quoted from the FY 1979 appropriation appeared in the proposed bill, H.R. 7998, 96th Cong., 2d Sess. (1980), for the FY 1981 appropriation, but not in the final enactment. *See* Education Memorandum, Attachment B at 2.

[4] *See* Pub. L. No. 100-202, 101 Stat. 1329-1 (1987) ("FY 1988 Appropriation Act); Rettman Letter at 3-4.

> $6,044,097,000 *together with an additional $131,000,000 which shall be available only for unfinanced costs in the 1989-90 award year Pell Grant program . . . .*

Pub. L. No. 101-166, 103 Stat. at 1181 (emphasis added).

The Department currently expects a 1989-90 award year shortfall of $265,000,000 over and above the $131,000,000 earmarked by the FY 1990 Appropriations Act. You have advised us that unless the Department can draw on additional funds from the FY 1990 appropriations to meet this shortfall, its only practicable recourse will be "to discontinue all further awards or payments to schools (and, indirectly, to students) or to announce a reduced payment schedule." Stringer Letter at 3.

## II. Analysis

As a general proposition, "the absence in the terms of an appropriations act of a prohibition against certain expenditures under that appropriation implies that Congress did not intend to impose restraints upon an agency's flexibility in shifting funds among activities or functions within a particular lump sum account." 4B Op. O.L.C. 701, 702 (1980); *see also* General Accounting Office, *Principles of Federal Appropriations Law* at 5-95 (1982) (restrictions on a lump sum appropriation contained in an agency's budget request or in legislative history are not binding unless they are specified in the appropriations act itself). Thus, lump sum appropriations available to an agency in a given fiscal year can generally be used to meet any program expenses that are incurred within the same fiscal year. Presumptively, then, expenses incurred in the operation of the Pell grant program within FY 1990 — including program expenses incurred in the nine months of the 1989-90 award year that occur in FY 1990 — can be paid out of the Department's FY 1990 appropriation, unless Congress has determined otherwise.[5] The central question therefore is whether Congress has restricted the Department's presumptive authority to draw on the FY 1990 lump sum appropriation to meet the shortfall for the 1989-90 award year. We conclude that Congress has imposed no such restriction.

---

[5] This view accords with prior Congressional understanding of the Pell grant appropriation. Thus, the appropriation for the program in FY 1978 was found on later estimates to exceed the expenses required for the 1978-79 award year. This left some $561,000,000 still available at the end of the 1978-79 award year in June, 1979. The legislative history to Pub. L. No. 96-123, 93 Stat. 925 (1979), reflects that Congress understood that that money remained available for obligation until September 30, 1979, *i.e.*, the end of FY 1978. Accordingly, Congress understood that that amount could be spent before September 30, 1979, to pay grant awards for the 1979-80 award year. As the Senate Report on H.R. 4389, a predecessor of Pub. L. No. 96-123, stated, *see* S. Rep No. 247, 96th Cong., 1st Sess. (1979), "[i]n other words, all funds will be obligated during the fiscal years for which they were appropriated. The only difference is that they will be used by students in different school [*i.e.*, award] years than was originally planned. Both HEW and the Office of Management and Budget agree that this can be done." *Id.* at 116.

Our starting point is, of course, the language of the FY 1990 Appropriations Act itself. *See supra* pp. 70-71 (quoting statute). That language does not in terms limit the Department's authority to use the lump sum funds only for program expenses for the upcoming 1990-91 award year. The language makes an appropriation of $6,044,097,000 for Pell grant program expenses without limiting the use of those funds to program costs arising in any single award year. The language then provides "an additional $131,000,000 to the specific purpose of paying off the 1989-90 award year deficiency; it does not, however, limit the use of the lump sum appropriation, nor does it state that the $131,000,000 which shall be available only for unfinanced costs in the 1989-90 award year Pell Grant program." In effect, this proviso limits the use of the $131,000,000 to the specific purpose of paying off the 1989-90 award year deficiency; it does not, however, limit the use of the lump sum appropriation, nor does it state that the $131,000,000 is the only amount that may be used for retiring the deficiency. Thus, we see nothing in the express language of the FY 1990 Appropriations Act that prohibits the Department from using the lump sum appropriation to cover a prior award year's deficiency if the $131,000,000 earmarked for that purpose proves insufficient.

Such a construction of the FY 1990 Appropriations Act accords with its legislative history. The Conference Report details the background to the FY 1990 appropriation, including the Administrations's revised estimate of a $331,000,000 deficiency for award year 1989-90, OMB's warning to Congress that the Administration would seek to recover program funds from individual grantees if additional funds to meet the deficiency were not provided in FY 1990, and the Congressional Budget Office's counter-estimate of a deficiency "of not more than $131 million." H.R. Conf. Rep. No. 274 at 40. The Report then states:

> Based on this information, the conferees have provided an immediate appropriation of $131 million to cover the funding shortfall for the 1989/1990 academic year. Although the conferees have provided explicit legislative authority for the use of funds for the 1989 shortfall, the conferees do not necessarily concur in OMB's view that this language is necessary in order for funds to be used for this purpose. The conferees note that OMB's policy differs substantially from previous Administration practice in handling the financing of current year shortfalls. As a result of this 1989 appropriation and some 1989 savings achieved through the provisions cited below [6], the conferees consider any attempt to impose a linear

---

[6] The "1989 savings" that the conferees expected to achieve were to come from the bill's changes in Pell grant funding, specifically the facts that it "limit[ed] the discretion of student aid administrators in

Continued

reduction of Pell Grant awards in the current academic year to
be both unacceptable and unnecessary.

H.R. Conf. Rep. No. 274 at 40-41.

Although this language is not free from ambiguity, we believe that it
supports the Department's position. The Report clearly states that the con-
ferees provided an "immediate" appropriation to be applied to the shortfall,
but that they did not concur in the view that special language was necessary
to achieve that purpose. Moreover, the Report notes that OMB's view was
contrary to prior practice, in which the Department had drawn on the lump
sum to prevent linear reductions from taking effect without obtaining a spe-
cial appropriation earmarked for that purpose. These statements, in conjunction
with the conclusion that the conferees would find linear reductions unaccept-
able, strongly suggest that the conferees believed the Department could,
consistent with prior practice, also draw on the lump sum appropriation to
prevent linear reductions if the $131,000,000 proved insufficient. The Report
in no way demonstrates that Congress thought specific language, like that
used in the past, was *necessary* for the lump sum to be used as the Depart-
ment intends. At most, the Report does not address that issue squarely.
Under those circumstances, the Department's presumptive ability to use the
lump sum appropriation for any expenses incurred within the fiscal period
applies.[7]

## B. The FY 1979-1987 Appropriations Acts

OMB argues that the language Congress included in annual appropria-
tions acts from FY 1979 through FY 1987, providing that moneys appropriated
for the Pell grant program "shall first be available" to meet deficiencies in
funding for the award year in progress, was required in order for the Depart-
ment to have the authority to use the lump sum for that purpose. OMB
argues that the absence of such language in the FY 1990 Appropriations Act
prevents the Department from using the lump sum appropriation for FY
1990 to meet the 1989-90 award year deficiency. *See* Rettman Letter at 9;

---

[6](....continued)
adjusting Pell Grant awards at the campus level," that it "implement[ed] the Administration's proposal
for the implementation of pro-rata refund policies at postsecondary institutions with loan default rates
in excess of 30 percent," and that it "delay[ed] the eligibility of students attending on a less than half time
basis for Pell Grant awards." H.R. Conf. Rep. No. 274 at 41

[7] Senator Harkin's floor statement explaining the purpose of the $131,000,000 appropriation also notes
that this prior practice was to be preserved. *See* Stringer Letter at 2 n.4. Senator Harkin stated that "in
reserving this amount for the shortfall, it was not intended that the Secretary of Education be precluded
from using other available funds in the Pell grant appropriation, as done in previous years, to cover the
unfinanced costs for the current academic year." 135 Cong. Rec. S15, 804 (daily ed. Nov. 16, 1989).
Of course, it is true that Congress' *primary* intention in appropriating a lump sum of $6,044,097,000
for the Pell grant program for FY 1990 was to fund the program's expenses for the 1990-91 award year.

Continued

73

Education Memorandum at 8. We reject that negative implication for two main reasons.

We believe the language of the prior appropriations acts did not provide "additional authority not otherwise available to the agency head." Rettman Letter at 9. Rather, the requirement that appropriated funds "shall first be available" to meet an outstanding deficiency establishes a priority use for funds that the Department otherwise would have had authority to allocate to any expenses incurred within the fiscal year for which the appropriation was made, regardless of the award year. *See* Education Memorandum at 8. The form of words chosen by Congress — requiring that the Pell grant appropriation *first* be available for paying a program deficiency from a pending award year — says that Congress wanted to ensure that the Department applied the appropriation to the deficiency before it expended funds for other purposes. In our view, the plain language of these provisions constitutes a limitation on existing authority, rather than an affirmative grant of new authority. Congress' underlying intent was apparently to prevent the Department from pursuing alternatives to a draw-down on the lump sum appropriation, such as imposing linear reductions.

The pattern of Congress' decisions from FY 1979 through FY 1987 is thus entirely consistent with its decision in FY 1990. In each of these appropriations, Congress appears to have wanted to prevent the hardship that would have been caused by imposing linear reductions. To that end, Congress consistently provided alternatives to the linear reduction procedure. In the early years, Congress *mandated* the first use of the lump sum appropriation to cover a shortfall, thus limiting the Department's discretion to spend the money for other purposes and impose linear reductions instead. In FY 1990, Congress achieved the same end by appropriating what it believed to be an ample sum for the specific purpose of retiring the shortfall.[8] Nevertheless, the conferees made clear that they did not approve of a deviation from the past practice of resorting to the lump sum rather than permitting linear reductions to take effect. Against this background, it is implausible to

---

[7](....continued)
*See* B-236667, Opinion of the Comptroller General, 1990 WL 277766, at *2 (Jan. 26, 1990) ("Each two-year appropriation provides funding intended primarily for the award year beginning nine months after its enactment."). However, the fact that Congress believed that the bulk of the lump sum appropriation would be applied to award year 1990-91 expenses does not preclude its availability to meet the award year 1989-90 deficiency.

[8] OMB notes that at the time of the FY 1986 appropriation, Senators Weicker and Proxmire disavowed Congress' prior practice of requiring mandatory draws against appropriations to cover current award year expenses. *See* Rettman Letter at 3; 131 Cong. Rec. 34,997 (1985) (remarks of Sen. Weicker); *id.* (remarks of Senator Proxmire). Senator Weicker stated that "the conferees direct that the Secretary take whatever steps are available to him under current statutory authority to ensure that 1986 program costs are reduced to a level consistent with the appropriation," thus implying that the mandatory draw-down would not be repeated in the FY 1987 appropriation, and that linear reductions should, if necessary, be imposed on the 1986-87 award year Pell grants. *Id.* Senator Proxmire agreed and stated that "[i]f there is any unanticipated shortfall in 1986 program costs, in spite of the $3.5 billion included in the conference report, then the Secretary of Education can make the necessary reductions consistent with existing law." *Id.* Despite these warnings, however, the FY 1987 appropriation again included mandatory draw-down language similar to that of prior years. *See* Pub. L. No. 99-591, 100 Stat. 3341-287 (1986).

maintain, as does OMB, that the FY 1990 appropriation *compels* the imposition of linear reductions and *forbids* the draw-down of lump sum funds.

## C. *Section 411(g) of the Higher Education Act*

Section 411(g) of the Higher Education Act, codified as section 1070a(g) of title 20, provides for the Department to apply "linear reduction[s]" to specified classes of grants if, "for any fiscal year, the funds appropriated for payments under this subpart are insufficient to satisfy fully all entitlements, as calculated under subsection (b) of this section [providing means of calculating grants for the award year]." *See supra* note 2 (quoting statute).[9] OMB construes section 411(g) to require the imposition of linear reductions whenever a deficiency arises near the end of an award year (here, the 1989-90 award year), thus preserving the current appropriation (the FY 1990 appropriation) for use in the next award year (the 1990-91 award year). It maintains that this "linear reduction" authority is "that which makes Pell grants a discretionary program, since it provides a statutory tool permitting the program to operate at any given appropriation level." Rettman Letter at 2. The Department argues that neither the FY 1990 Appropriations Act nor section 411(g) in terms requires that lump sum appropriations be restricted to use in a *single* award year. Hence, the Department concludes, it has the discretion to allocate such funds between two award years within the same fiscal year period of availability. *See* Education Memorandum at 5. We agree with the Department's view.

The literal language of section 411(g) does not require the imposition of linear reductions on previously awarded Pell grants whenever a deficiency arises within an award year, even in cases where funds are available within an applicable fiscal year period to meet such a deficiency. The section states only that linear reductions shall be made "[i]f, for any fiscal year, the funds appropriated for payments under this subpart are insufficient to satisfy fully all entitlements." 20 U.S.C. § 1070a(g). The statutory reference to "entitlements" does not, by its terms, refer only to grants for the *following* award year. Nothing in the linear reductions provisions, in fact, indicates which award year's entitlements are to be reduced. It states only that entitlements must be reduced whenever funds appropriated for any *fiscal* year — not award year — are insufficient. As matters now stand, the funds available for expenditure in FY 1990 for program costs are *not* "insufficient to satisfy fully all entitlements" that now must be covered for the remainder of the 1989-90 award year. To be sure, a draw-down of $265,000,000 from the FY 1990 lump sum appropriation to cover the 1989-90 award year deficiency may eventually cause the lump sum appropriation to be "insufficient to satisfy fully all entitlements" pertaining to the 1990-91 award year. But at the moment, the funds available to be expended for current Pell grant

---

[9] The FY 1990 Appropriations Act does not restrict or repeal section 411(g).

entitlements are more than sufficient, and the Department need not impose linear reductions to cover the 1989-90 award year shortfall.

OMB reads section 411(g) to mean that if an appropriation for an award year is insufficient to meet all entitlements within the same award year, linear reductions are mandatory. This construction assumes that the *sole* purpose of any Pell grant appropriation, unless otherwise stated, is to fund program expenses for a single award year. But the language of the FY 1990 Appropriations Act is not so limited. Moreover, as noted above, OMB's view implicitly substitutes "award year" for "fiscal year" in the text of the linear reduction provisions, with no basis for doing so. *See* Letter for Lynda Guild Simpson, Deputy Assistant Attorney General, Office of Legal Counsel, from Steven Y. Winnick, Deputy General Counsel for Program Service, Department of Education at 2 (Feb. 15, 1990). Even accepting OMB's point that the Higher Education Act contains other language showing that the Pell grant program is structured on an award year basis, *see* Rettman Letter at 8, the linear reduction provision is not so limited, and it does not follow that an appropriation for a given fiscal year period must not be used to pay off the current award year's arrearages that occur within that fiscal period.

We therefore conclude that the Higher Education Act does not prohibit the Department from using the FY 1990 lump sum appropriation to pay off the deficiency from the 1989-90 award year.

*D. The Anti-Deficiency Act*

OMB also argues that the Anti-Deficiency Act supports its view. It contends that the Department's analysis

> would allow the possibility of increasing debts rolling forward each year into the next fiscal year, resulting in a possible violation of the Anti-Deficiency Act: if the Department is permitted an indefinite draw on one year's appropriation to pay for shortfalls in the prior award years, then the funds available for the current award year will be that much more insufficient, increasing the underfunding of the current year -- with no fiscal accountability and with Congress coerced into appropriating that deficiency at some point in the future.

Rettman Letter at 4-5.

The Anti-Deficiency Act, 31 U.S.C. § 1341,[10] is intended in part "to keep

---

[10] The pertinent provisions of that Act, 31 U.S.C. § 1341(a)(1), read as follows:
An officer or employee of the United States Government . . . may not—
   (A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation; or
   (B) involve [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law.

all the departments of the Government, in the matter of incurring obligations for expenditures, within the limits and purposes of appropriations annually provided for conducting their lawful functions, and to prohibit any officer or employee of the Government from involving the Government in any contract or other obligation for the payment of money for any purpose, in advance of appropriations made for such purpose." 55 Comp. Gen. 812, 823 (1976) (quoting 42 Comp. Gen. 272, 275 (1962)).[11]

We do not believe that by drawing on the FY 1990 lump sum appropriation to pay off the remainder of the 1989-90 award year deficiency, the Department would violate terms of the Anti-Deficiency Act.[12] The use of the FY 1990 appropriation to pay off the deficiency would not be "an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation," 31 U.S.C. § 1341(a)(1)(A), because, as explained above, the Department may expend the lump sum appropriation for any program costs incurred within the fiscal year period of availability. Nor would such action by the Department "involve [the] government in a contract or obligation for the payment of money before an appropriation is made." 31 U.S.C. § 1341(a)(1)(B). Even assuming that a draw of $265,000,000 from the FY 1990 appropriation would leave that appropriation insufficient to cover program expenses connected with the 1990-91 award year, that result would not in itself create an obligation to fund grant awards for that award year at the levels currently contemplated, or compel Congress to enact a supplemental appropriation to cover a deficiency for that award year. Congress may, at any time, decline to appropriate more funds. Under those circumstances, appropriated funds in a fiscal year *would* be insufficient to satisfy entitlements, and linear reductions would take effect.

Accordingly, we conclude that the Department would not violate the Anti-Deficiency Act if it paid the current award year shortfall out of the FY 1990 lump sum appropriation.

---

[11] *See also Hooe v. United States*, 43 Ct. Cl. 245, 260 (1908), *aff'd*, 218 U.S. 322 (1910) (Congress' specific appropriations must not be exceeded for any fiscal year); 39 Comp. Gen. 422, 425 (1959) ("The object of the statute was to prevent executive officers from involving the Government in expenditure or liabilities beyond those contemplated and authorized by the Congress."); 55 Comp. Gen. 768, 773-74 (1976) (current fiscal year funds cannot be applied either directly or through reprogramming to liquidate contract obligations incurred in prior fiscal years).

[12] Indeed, we do not understand OMB to argue that a *per se* violation would exist, since it merely claims that "a *possible* violation" would occur, *see* Rettman Letter at 4-5 (emphasis added), if deficiencies continued to roll forward from one fiscal year to the next indefinitely

## Conclusion

We conclude that neither the FY 1990 Appropriations Act, the Higher Education Act, nor the Anti-Deficiency Act prevents the Department from using the lump sum appropriation in the FY 1990 Appropriations Act for paying deficiencies in excess of $131,000,000 in the Pell grant programs funding for the 1989-90 award year.

WILLIAM P. BARR
*Assistant Attorney General*
*Office of Legal Counsel*